(8 App. Div. 509)

### DINNIHAN et al. v. LAKE ONTARIO BEACH IMP. CO.

(Supreme Court, Appellate Division, Fourth Department. July 30, 1896.)

1. NEGLIGENCE—DANGEROUS PREMISES—BATHING BEACH.
   One who maintains a public bathing beach must be vigilant in keeping the premises safe for his customers, and he cannot escape liability merely by showing that he did nothing to render the premises unsafe.

2. DEATH BY WRONGFUL ACT—EXCESSIVE DAMAGES.
   A verdict in favor of a father, a laboring man, for $4,000 for the death of a daughter 16 years old, who, since her mother's death, two or three years before, had taken care of her father's house, is excessive, where there is no evidence as to the relations which existed between plaintiff and decedent, or of his or her character or capabilities.

3. SAME—POSSIBILITY OF DISCONTINUANCE OF SERVICES.
   That an infant daughter might have married, died, or left her father's service, on coming of age, are possibilities which should be considered in determining the father's pecuniary loss in an action for the death of the daughter.

Appeal from circuit court.

Action by John Dinnihan and James L. Hotchkiss, as administrators of Katherine Dinnihan,.against the Lake Ontario Beach Improvement Company, to recover damages for the alleged negligent killing of plaintiff's intestate. From a judgment entered on a verdict in favor of plaintiff, and from an order denying a motion for a new trial, made on the minutes, defendant appeals. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

Edward Harris, for appellant.

Thomas Raines, for respondents.

FOLLETT, J. This action was begun July 6, 1892, to recover damages, under section 1902, Code Civ. Proc., for the alleged negligent killing of the plaintiff's intestate. The defendant is a domestic corporation, and owns realty on the beach of the south shore of Lake Ontario, in the village of Charlotte, which is known as "Ontario Beach." For several years past it has conducted an hotel on the beach, and has several bath houses or rooms in which persons desiring to bathe prepare for the bath, and dress after returning therefrom. The defendant charges 25 cents for each person using a bath house and its bathing facilities. In 1885 the defendant sank in the lake, about 150 feet north of the shore, a crib 12 feet wide, 20 feet long, and about 10 feet high. Four or five feet of the lower end of this crib was sunk into the sand underneath the water, was loaded with stone, and so held in place. Usually the top of the crib is about one foot above the surface of the lake, and the water about it is usually four or five feet deep. This crib or platform was erected so that bathers could stand on it and jump into the water. For some time there was a spring board attached to the crib from which the bathers jumped into the water, but a year or two before the accident complained of this board was removed. This crib was used by men only. In 1887 or in 1888 the defendant erected in the lake, about 150 feet north of the shore, and substantially parallel therewith, a tobog-

gan slide, for the use of bathers. This slide is about 12 feet wide and 80 feet long, and slopes from the west to the east, the west end being several feet above the water, and the east end being a foot or two above it. On the south side of the slide, and near the west end, there is a stairway, by which the platform or starting place of the toboggans is reached. This slide is supported by two rows of piles driven into the ground under the water, the piles being about 12 feet apart. The west end of the slide is two or three feet south of the crib. The northwest corner pile of the slide is two or three feet from the southwest corner of the crib. From the shore an inch rope extends to the west end of the slide, and is fastened to the northwest or the southwest corner pile of the toboggan slide. Between this end of the rope and the shore end are attached to it several wooden buoys, by which it is supported. From the east end of the slide a like rope is extended to the shore, and supported by buoys. These ropes are not parallel, their shore ends being several feet further apart than their ends at the slide. There was a sharp controversy between the witnesses whether a rope extended from the north ends of these two ropes, and so formed a defined bathing ground for bathers. It is conceded that the water at this beach deepens very gradually, and that the ground underneath it is smooth, and slopes gradually, so that for four or five hundred feet north of the toboggan slide the water, except when it is high, is only about five feet deep. It was also proved, and not contradicted that the bathers patronizing the defendant were accustomed to go east and west of these exterior lines and north of the toboggan slide. About noon of August 14, 1890, the decedent held a ticket, issued by the defendant, which entitled her to the use of a bath house and to bathe in the waters of the lake adjacent to the beach. Another lady held a like ticket, and both entered the water together. No other persons were bathing at this time. They were seen to walk along by the west rope, holding on to it, jumping up and down, and going towards the toboggan slide. Shortly an alarm was heard, and persons on entering the water found the two ladies at the west end of the toboggan slide, which, as before stated, is just south of the crib, struggling in the water beyond their depths. The decedent's companion was rescued, but the decedent was found drowned in a deep hole near the northwest pile of the toboggan slide. There is substantially no dispute about the size of this hole. It was the deepest in the center, and sloped in all directions. It was, as described by the witnesses, shaped like a basket. One witness, who measured it, said it was eight feet and four inches deep at the deepest point. Another witness, called by the defendant, who measured it, said it was seven feet and six inches at the deepest point, but all agreed that the water at this place was so deep that it would come considerably over the head of any person. The plaintiffs founded their right to recover on the neglect of the defendant to prevent the dangerous hole from existing under the waters which its customers were known to frequent. One witness testified that in August, 1888, he rescued a young man from drowning who got into this hole while bathing. It was not shown that the defendant or any of its employés knew of this circumstance,

but it shows that the hole had existed for at least two years. The formation of this hole was sought to be accounted for by the plaintiffs on the theory that the water drawing through between the end of the crib and the pile created a current which washed away the sand around and near the pile. Considerable evidence was given to support this theory, and none given to contradict it. It was also testified, and not contradicted, that this hole could be seen by looking from the surface of the water down into it. There was little controversy about the facts. There was, as before stated, a sharp controversy whether a rope extended from the north ends of the side ropes along the toboggan slide, so as to keep bathers from going beyond or north of the slide. This question, however, was left to the jury under a charge not excepted to in this respect, and was found for the plaintiffs. The evidence warranted different inferences, and the jury were instructed that if they found from all the facts and circumstances the defendant had set apart and fenced in with ropes a definite space wherein its customers were to bathe, and it was so understood, or ought to have been so understood by the decedent, the plaintiffs could not recover because she was found drowned in a deep hole about eight or ten feet outside of these lines. The learned trial judge correctly instructed the jury that the defendant was bound to be active and exercise vigilance to keep the grounds whereon it invited its customers to bathe from becoming dangerous; that this duty was an active one, and that the defendant could not escape liability by showing simply that it did nothing to produce this hole. These instructions laid down the rule of law applicable to the liabilities of keepers of bathing beaches. There was no evidence that the decedent, by her own neglect, contributed to the accident, except the fact that these two ladies were found outside of the ropes, and, as before stated, the court instructed the jury that if the ropes were intended by the defendant and understood by the decedent as the exterior bounds of the bathing grounds, she was negligent in going outside, and the plaintiffs could not recover. The two ladies were seen to do nothing while in the water except to walk along the east side of this west rope, holding on to it, and jumping up and down. We think there was evidence from which the jury were justified in finding that the defendant was guilty of negligence in not knowing of and guarding against this dangerous place, and there was also evidence from which the jury were at liberty to find that the decedent did not, by her own negligence, contribute to the accident.

Several exceptions to rulings upon the admission and exclusion of evidence were taken in behalf of the defendant, but none of them are argued in the brief, nor were they discussed orally, and the same is true in respect to two or three unimportant exceptions to the charge.

The jury rendered a verdict for $4,000 damages, which the trial court was asked to set aside as excessive, and this court is also asked to set it aside on that ground. The father was not sworn, and we know nothing of the relations which existed between him and the decedent, or of his or her character, capabilities, or employ-

ments, except as disclosed by the testimony of a sister of the decedent, who testified that the father is a laboring man, about 55 years of age, having no steady employment; and working wherever he could find employment. His wife died August 12, 1887, leaving three daughters. The eldest is married, and lives away from home. The second (the witness) was 21 years of age at the time of the trial, and had lived away from home, at service, for 6 years. The decedent was the youngest, and was 16 years of age October 14, 1889, and since the death of her mother had taken care of her father's house. There is no evidence in respect to her habits, capabilities, intelligence, or education. The statute (section 1904, Code Civ. Proc.) provides that "the damages awarded to the plaintiff may be * * * a fair and just compensation for the pecuniary injuries resulting from the decedent's death to the person or persons for whose benefit the action is brought." This action was brought for the sole benefit of the father. The interest on the verdict would exceed the sum which the decedent could have probably earned, and, besides, the principal will be left to the father. The fact that she might have married, or died, or left her father's service on becoming of age, are possibilities which should be taken into account in determining his pecuniary loss. Considering these possibilities, and taking into account the probable duration of her life, and the meager evidence of damages, we think the verdict excessive, and that a judgment for $2,500 will cover the pecuniary loss of the father.

The judgment and order should be reversed, and a new trial granted, with costs to abide the event, unless the plaintiffs stipulate to reduce the damages to $2,500, in which case the judgment and order, as so modified, should be affirmed, without costs. All concur.