Jasper McFARLAND and Margaret Mc-Farland (Plaintiffs), Respondents,

v.

Emilie GRAU and Alvin Grau, Defendants, Alvin Grau (Defendant), Appellant.

No. 29642.

St. Louis Court of Appeals.

Missouri.

Sept. 3, 1957.

Motion for Rehearing or Transfer to Supreme Court Denied Sept. 30, 1957.

George E. Lee, Doris J. Banta, St. Louis, for appellant.

F. D. Wilkins, Louisiana, Vatterott & Shaffar, St. Ann, for respondents.

RUDDY, Presiding Judge.

This is an action brought by the parents of Dennis McFarland for his death resulting from drowning in a lake, known as Grau's Lake, located on premises operated by the defendant as a general picnic, recreation and swimming area.

In the trial in the Circuit Court the jury found in favor of plaintiffs and after an ineffectual motion for new trial defendant appeals.

Plaintiffs in their petition alleged that the lake was approximately 250 to 300 yards wide and that their minor son attempted to follow some of his companions who had swum across said lake, and due to the negligence of the defendant, their son drowned. The negligence asserted was that defendant failed to take any precautions for the safety of his patrons; that he permitted and allowed any and all patrons, regardless of age, to swim in any and all portions of the lake; that he failed to have an area roped off, wherein patrons could swim with safety; and that he failed to provide signs or warnings indicating the depth of the water.

Defendant's answer, in addition to denying the averments of negligence in plaintiffs' petition, alleged that plaintiffs' son was contributorily negligent in that he knew that he was not a skillful swimmer and knew that the water was deep but, nevertheless, he undertook to swim across the lake.

Grau's Lake began to form in 1943 as the result of overflow from the Missouri River during a flood. The lake is located between the Mississippi River and the Missouri River, which rivers at this point are only six or seven miles apart. The Missouri River is higher at this point than the Mississippi River and at flood stage the Missouri River cuts a channel through the farm operated by the defendant and emp-

ties into the Mississippi River. When the 1943 flood receded the lake was formed. After this flood the cut forming the lake was 50 feet in width. Subsequent overflows of the Missouri River widened the cut. The last flood occurred in 1951 and it also changed the width of the lake. When defendant was asked in what respect the 1951 flood changed the appearance of the lake he said: "It made it wider, deeper and deposited more sand on top of the bank." A surveyor who testified found the lake 630 feet in width at one point. The over-all length of the lake was 1,700 feet. The swimming area was approximately 1,200 feet long. The other 500 feet were set aside for fishing. The area of the lake was estimated to be between 25 and 30 acres. Nothing was done to change the natural formation of the lake, except in 1954 when the defendant through a dragging operation straightened out the sand beach which had formed on one side of the lake. The sand beach was about 250 feet wide and was approximately 20 feet below the level of the ground prior to the formation of the lake. The other side of the lake had no sand beach, but had a vertical bank about 27 feet in height. However, the record shows that one could climb out of the water onto the bank.

The bed of the lake sloped gradually from the beach toward the opposite side. Twenty five feet from the water's edge on the beach side the water was 10 to 12 inches deep. One hundred sixty-five feet from the water's edge on this side of the lake it was 5 to 5½ feet deep. According to the testimony as the lake bed approached the bank opposite to the beach it was deeper and when within 10 feet of the bank the water was 18 feet deep. There was no evidence of step-offs or places where the water suddenly got deeper. One of the boys who had accompanied Dennis testified there was no current in the lake and that the temperature of the water was comfortable. Another witness stated the water was absolutely still.

After the lake was formed defendant permitted people to fish in the lake, for which he charged an admission price. Subsequently he admitted and invited the general public to picnic and swimming privileges for which he charged a fee. Defendant admitted that he had as many as 800 people visit the lake and picnic grounds in one day. On the day Dennis drowned it was thought that as many as 200 people were present and that most of them were in the water.

There were no lifeguards present on the occasion that forms the basis of this suit and there were no signs in or about the lake indicating the depth of the water or the width of the lake. The record shows that the only sign present indicated the separation between the swimming and fishing areas. There were no life preservers or rescue equipment of any kind on the premises, except a boat which was approximately 300 feet from the water's edge at a house adjacent to the sandy beach. This boat contained no rescue equipment. There were no ropes separating the shallow water from the deeper water. It seems from the evidence that the only thing furnished by the defendant for the admission price was the water in which to swim.

The defendant admitted that he permitted any person who would pay the admission fee to enter his premises for swimming and that he made no inquiry about their swimming ability. When he was asked if he had any restrictions about people entering his place, he said, "We didn't admit any babies, any small children."

The tragedy of Dennis' death occurred May 29, 1954. The following September he would have reached his fifteenth birthday. His mother described him as 5 feet 9 or 10 inches in height, weighing between 135 and 140 pounds, and in good health. He had no physical defects of any kind. He was in the first year of high school and must have possessed the intelligence of an average youth of his age. The record indicates he was a very industrious youth. At the time

of his death he was employed as a car hop and at other times worked as a caddy at a golf club and was a newspaper delivery boy.

The testimony indicates that Dennis had been swimming at Grau's Lake before May 29, 1954. It is obvious from the record that he was not a very good swimmer. One of his companions described him as "all right but not very good." Another thought he "wasn't too good" and that he could not swim far. This same witness testified that Dennis was "just able to stay on top" of the water. Another of Dennis' companions classified him as a medium swimmer. The father of Dennis testified that he had enrolled Dennis at the Y.M.C.A. for a summer swimming course when he was 10 or 11 years of age and he thought Dennis was an average swimmer.

It appears that all of his companions, five in number, were older than Dennis. Two of the companions of Dennis had lifeguard training and one other had received life-saving instructions for two weeks at a Scout Camp. One of these boys testified that he was qualified to rescue persons who were in distress or in danger of drowning in the water.

On the day of the tragedy, Dennis and his five companions had arranged to meet at a drug store near his home. After they assembled they all traveled by automobile to Grau's Lake. Dennis had told his mother where he was going. As the boys entered the premises each paid a 50 cent admission fee to a lady, who gave them no instructions about the lake and made no inquiry of any sort. The six boys changed into swimming trunks and went down to the beach and entered the water. They found it too shallow near the edge and walked out into the deeper water. They played around in this water, which was about waist high, for a while, when someone in the group suggested swimming across the lake to the far side where the water was deep enough to dive. One of the boys who had been to the lake before said he knew of a log on the bank on the other side of the lake from which they could dive. The testimony shows that the boys knew it was deep on the other side of the lake when the decision was made to swim across.

One of the companions of Dennis testified that Dennis said he did not want to try to swim across and when this witness was asked, "And you knew that he was not going to try to start across because he indicated that to you?" he answered, "Yes." Another companion when asked about the reaction of Dennis to the suggestion to swim across the lake, testified as follows:

"Q. Where was Dennis at this time? A. He told me that he was going to stay behind.

"Q. Is that all he told you about what he was going to do? A. He told me that he didn't think that he could make it, so he was going to stay behind.".

On cross-examination this same witness testified:

"Q. Did you hear Dennis say why he was staying back? A. He said he couldn't make it."

One of the witnesses for plaintiffs was a young man, Richard Eckert, who was not in the group of boys with Dennis, but who had joined in the rescue efforts. He testified, that you could see it was "a long way" across the lake. He said, "It looked even longer" than its actual width.

Four of the boys started to swim across the lake in search of the diving spot. Dennis and another boy, Carlton Wright, stayed behind. Sometime later Carlton Wright swam across, following the other boys. The record does not show just when Dennis started to swim across the lake. Obviously, it must have been sometime after the other five boys started across.

Two of the boys in the group with Dennis on the day of his death testified that they did not look back while they were swimming across the lake to see if Dennis

was following them. One of them said, "I didn't figure he would be" and in another part of his testimony he said that Dennis had not said anything to indicate he was going to swim across the lake. The only reasonable inference that can be drawn from the testimony of these two witnesses is that none of the companions of Dennis expected him to swim across the lake because he had indicated "he couldn't make it."

When the boys were about two-thirds of the distance across the lake one of their number became tired and called for assistance. Two of the other boys assisted him the rest of the way until he reached the bank in safety. The record indicates that when this boy made his request for assistance he was in deep water. One of the witnesses in explaining this occurrence said, "He just got tired. It was too far."

The five boys reached the bank opposite to the beach at approximately the same time. After they climbed onto the bank out of the water two of the boys started to walk back to the beach side of the lake. The other three boys walked along the edge of the water seeking the suggested diving spot. They walked along the bank for approximately 50 feet, which took them about two or three minutes. They found the diving spot they were looking for, but someone was fishing there. After standing there about one minute they heard a cry for help. This first cry was followed by two other cries for help. All of the cries were made in rapid succession. At first the boys ignored the cries, thinking somebody was fooling and, as one of the witnesses described it, they thought the person crying for help was "messing" around. They had no idea it was Dennis crying for help. However, it became apparent to them that the cries were in earnest and within about one minute after they heard the first cry the three boys dived in the water and swam for the spot in the lake where they had seen the person who uttered the cries for help. When they saw the person who was crying for help dis-

appear under the water they determined that his cries were in earnest. They all swam to the place where they saw the person disappear and dived under the water in an effort to locate him. They remained at this spot for about ten or twenty minutes continuing their efforts to locate the person, but were unsuccessful. It was when they returned to the beach that they learned that the person crying for help must have been Dennis.

Richard Eckert heard the cries for help. At this time he was on the beach side of the lake. He saw someone "raising a rumpus out there," fighting the water and splashing around about 450 to 500 feet from the edge of the water on the beach side. After the second cry for help, he and a companion proceeded to swim to the point where they saw the person struggling in the water. When they reached this point they found the companions of Dennis had reached there first. He and his companion joined in the efforts to find the person and met with no success. They returned to the beach, at which time they saw two men carrying the boat that was up at the house. They assisted in taking the boat out to the spot where they were before and again they dived into the water seeking the body. Their second effort to find the body was also unsuccessful. Richard Eckert testified there were no grab hooks in the boat. According to the testimony it was twenty minutes after the cries for help before the boat was launched in the water. Defendant testified that the boat was kept near a house which was about 300 feet from the water's edge. The boat had to be carried the entire width of the sand beach. Sometime later the St. Charles County Volunteer Emergency Corps arrived and proceeded to drag the lake and found the body of Dennis midway between the sand beach and the opposite bank.

■ It is the duty of the owner or operator of a public place of amusement, such as the place operated by the defendant

in the instant case, who invites the public to use his accommodations, to use reasonable care in furnishing and maintaining such accommodations for the purpose for which they were apparently designed and to which they are adapted. Perkins v. Byrnes, 364 Mo. 849, 269 S.W.2d 52, loc. cit. 55; Blanchette v. Union Street Railway, 248 Mass. 407, 143 N.E. 310.

A more extensive statement defining the duties of owners and operators of swimming resorts is found in the case of Larkin v. Saltair Beach Co., 30 Utah 86, 83 P. 686, loc. cit. 690, 3 L.R.A.,N.S., 982. In this case the court said:

> "* * * It is well settled that the owners of resorts to which people generally are expressly or by implication invited to come are legally bound to exercise ordinary care and prudence in the maintenance and management of such resorts to the end of making them reasonably safe for the visitors. And when the business is that of keeping or carrying on a bathing resort, the authorities hold that the proprietors or owners thereof are not only required to exercise that same degree of care and prudence with respect to keeping the premises in a reasonably safe condition, which the law imposes upon keepers of public resorts generally for the protection of their patrons, but the law imposes upon them the additional duty, when the character and conditions of the resort are such that because of deep water * * * or other causes, the bathers may get into danger, of having in attendance some suitable person with the necessary appliances to effect rescues, and save those who may meet with accident. Not only is it the duty of the owners of bathing resorts to be prepared to rescue those who may get into danger while in bathing, but it is their duty to act with promptness, and make every reasonable effort to search for, and, if possible, recover those who are known to be missing."

In the instant case the jury was instructed that if defendant failed to provide warnings as to the depth of the water and failed to provide appliances, ropes and persons to superintend bathing and persons and appliances to rescue bathers when in danger and that in so failing defendant was negligent and that such negligence was the direct and proximate cause of the death and drowning of Dennis McFarland, then their verdict could be for plaintiffs. Defendant virtually concedes that he was in fact negligent in some of the respects charged by the plaintiffs and that the evidence presented by plaintiffs would warrant a jury in so finding.

However, defendant in his first point contends that plaintiffs failed to prove that any negligence of the defendant was the proximate cause of the death of Dennis McFarland. It is the position of the defendant that the jury could not have found any causal connection between defendant's negligence and the death of Dennis without resort to guess, speculation and conjecture. In view of defendant's admitted negligence we will not discuss the facts demonstrating wherein defendant was negligent. To do so would be assuming a burden that is not before the court. However, we do express the opinion that there was ample evidence on which to base the verdict of the jury that defendant was negligent. Lottes v. Pessina, Mo.App., 174 S.W.2d 893.

Many definitions of the term "proximate cause" may be found in the cases, but the one that sufficiently applies to the facts of this case may be found in the case of Lottes v. Pessina, supra, wherein this court said:

> "The established rule is that it is not necessary where a defendant's negligence has been established, that plaintiff go further and show, in addition thereto, that the particular consequences of such negligence could have been foreseen by the defendant; all that plaintiff need show is that the injuries are the natural, although not

the necessary and inevitable, result of defendant's negligence, that is, that such injuries were likely, under ordinary circumstances, to follow from defendant's negligent act. 38 Am.Jur., Negligence, p. 714, § 62." 174 S.W.2d loc. cit. 897.

We have examined many cases involving deaths from drowning, wherein the issue of the causal connection between defendant's negligence and the death of plaintiff's decedent was discussed. Most of them involve the same specifications of negligence charged in the instant case. Some of the cases hold as a matter of law that defendant's negligence was not the proximate cause of the drowning while others hold the proximate cause was for the jury. We think the better reasoning is found in the cases wherein defendant's negligence was found sufficient to make the issue of proximate cause one for the jury's determination.

In the case of Collins v. Riverside Amusement Park Co., 61 Ariz. 135, 145 P.2d 853, loc. cit. 859, decedent was a boy 14 years of age and it was alleged that he was drowned through the negligence of the appellee. The principal negligence relied on was the failure of defendant (appellee) to have a lifeguard present in actual attendance with the necessary appliances to rescue persons who might submerge in the pool and be unable to extricate themselves therefrom. The trial court directed a judgment for the defendant and the plaintiff appealed. The Supreme Court of Arizona said:

"We hold that the evidence was too conflicting for the court to direct a verdict, and the case should have been decided by the jury."

The effect of the court's holding in this case was that it was for the jury to determine whether defendant's negligence was the proximate cause of death.

The court in so holding relied on similar holdings in other cases. The principal case from which the court quoted extensively was the City of Longmont v. Swearingen, 81 Colo. 246, 254 P. 1000. In that case plaintiffs sought recovery for the death of their son which they alleged was due to the failure of the defendant who maintained and operated a swimming pool to provide a lifeguard or attendant to render assistance in time of need and that such failure was the proximate cause of their son's death. The Supreme Court of Colorado found that there was sufficient evidence on the question of negligence to require submission of the case to the jury and to sustain the jury's finding on that question. There was a judgment for the plaintiffs in the court below. On appeal defendant urged that there was no evidence that the defendant's negligence was the proximate cause of death. In ruling on this point the court said:

"* * * While it is true that there was no direct evidence that, if a lifeguard had been present, death would not have resulted, yet we think the facts and circumstances proven were sufficient, together with the inference which may logically be drawn from the evidence, to justify the finding that a failure to have a lifeguard there was the proximate cause of death.

"All that is necessary to warrant the finding of proximate cause is to establish by the evidence such facts and circumstances as would indicate with reasonable probability that the death was caused by drowning, which resulted from the negligence of defendant in not having a life guard present, because from this evidence it may fairly and logically be inferred that, had a life guard been present, death would not have resulted. The causal connection may be established by the circumstances. Proximate cause is a question for the jury. Tadlock v. Lloyd, 65 Colo. 40, 45, 173 P. 200.

"That the absence of a life guard, in the circumstances shown here, may

be negligence, cannot well be disputed, and we think is sustained by the authorities. (Citing cases.)

"To require direct evidence that, if a life guard had been present, death would not have resulted, would be to exact evidence which it would be impossible to obtain, and would result in a denial of justice." 254 P. loc. cit. 1002.

In the case at bar defendant admits that there were no lifeguards. However, he holds that the evidence fails to show that the presence of lifeguards and rescue equipment would have saved the life of Dennis McFarland. Defendant asserts that the evidence shows that lifeguards could not rescue Dennis. He claims that the two companions of Dennis who had lifeguard ratings came to the aid of Dennis as soon as was humanly possible and failed to effect rescue. The fact is that the evidence shows that these companions of Dennis did not come to his aid as soon as humanly possible. The evidence clearly shows that approximately one minute elapsed after they heard the first outcry before they dived into the water and attempted the rescue. The evidence also shows that they were a considerable distance away from where Dennis was swimming. Defendant also contends that these companions were closer to Dennis than any lifeguards employed by defendant would have been. We cannot say that all reasonable men would agree that the lifeguards would have been stationed at such a place as to not be able to reach Dennis timely for his rescue after the first outcry. It seems reasonable to assume that if lifeguards were present their principal attention would be on the persons swimming in the deep water and that consequently they would be stationed at places advantageous to a quick rescue of persons swimming in the deep water. It is a matter of common knowledge that drownings seldom occur in shallow water and are more likely to occur in deep water.

It is not an uncommon practice for swimming resorts with a body of water as long and as wide as Grau's Lake to have lifeguards stationed in boats or on rafts or platforms out in the water and adjacent to the deep water so that the rescue of persons needing help in the deep water may be more certain and effective. To hold that the proximate cause of the death of Dennis McFarland through the failure of the defendant to provide lifeguards and rescue equipment is not a jury question, is to place a premium on such negligence. Obviously if we were to hold as a matter of law that a jury could not find that the death of Dennis was caused through the negligent failure of defendant to have lifeguards and rescue equipment, it would be an encouragement to all operators of such resorts to omit these precautions. We agree with the statement in the case of City of Longmont v. Swearingen, supra, that it "would result in a denial of justice." [81 Colo. 246, 254 P. 1002]

The case of Nordgren v. Strong (Cullen v. Strong), 110 Conn. 593, 149 A. 201, loc. cit. 204, was an action to recover damages for the drowning of two persons due to the alleged negligence of the defendant. There was a judgment for the defendant and plaintiffs appealed. The court reversed the case and ordered a new trial because of an error in an instruction to the jury. In this case it was alleged that Ernest L. Nordgren was drowned in an effort to save Miss Cullen who was not a good swimmer and found herself in difficulty in deep water. In discussing the case relative to Miss Cullen the court said:

"* * * She was a patron, and the case in behalf of her representative depended upon whether the jury found that the defendant had failed to provide suitable supervision and suitable appliances which in the exercise of reasonable care he should have furnished, and that his failure to furnish these was the proximate cause, that is, the substantial factor, of the failure to rescue her and of her death."

In connection with the case of Ernest L. Nordgren the court said:

" * * * In the case in behalf of Nordgren the court correctly charged that Nordgren was not negligent in going to the rescue of Miss Cullen and that he was a patron of defendant, but the court did not instruct the jury that after Nordgren was in danger in attempting to rescue Miss Cullen, the defendant owed to him the duty of exercising reasonable care to rescue him from his peril, and that if Miss Cullen's danger and death were caused in whole or in part by the negligence of the defendant the defendant would be responsible for the drowning of Nordgren, provided the jury found that defendant's neglect was the proximate cause; that is, the substantial factor in causing his death. We think the court erred in not so charging in these terms or their equivalent." 149 A. loc. cit. 205.

The negligence asserted by plaintiffs was that the defendant was obliged to have a suitable person on hand and necessary appliances to effect rescues and save patrons in bathing and to make every possible effort to rescue those in danger. The court said:

"We think that questions of this character are questions of fact and not of law and for the decision of the jury, and that the court ought not, except in the exceptional case, to dispose of such questions as matter of law." 149 A. loc. cit. 204.

The court found, as quoted aforesaid, that the question of proximate cause was also for the jury.

In the case of Luck v. Buffalo Lakes, Inc., Tex.Civ.App., 144 S.W.2d 672, decedent was a youth 17 years of age who drowned in a swimming pool operated by the defendants. The jury found in response to special issues submitted by the court that the defendants were guilty of negligence in failing to install markers showing the depth of the water; in failing to install ropes; in failing to have on duty a competent and experienced lifeguard and in failing to have on duty a person experienced in first aid treatment for drowning persons. The jury also found that no one of the specified acts of negligence found by it was the proximate cause of the death of the deceased. The court in its opinion said:

"In our opinion the testimony on the issues of proximate cause on the acts of negligence relied on by the appellants was not so certain that reasonable minds could not differ thereon, was not so conclusive as to authorize the court to direct a verdict in behalf of appellants on these issues, and the findings of the jury thereon were binding on both the trial court and this court since proximate cause is a fact issue to be determined by the jury unless the court can say as a matter of law that proximate cause was established." 144 S.W.2d loc. cit. 675.

In the case of Larkin v. Saltair Beach Co., supra, it was admitted that there were no notices placed in the lake indicating the depth of the water, nor signs of any kind to advise the bathers of the limits of the resort within which they could bathe with safety; neither did it keep at the resort a person with the necessary appliances to rescue bathers from drowning when in danger. In fact, the only supervision exercised by defendant over its patrons was to invite and carry them out on a raft to deep water. The court further pointed out that in case any of the patrons through lack of information, inadvertence, or otherwise, got into water beyond their depth, or their situation was otherwise rendered perilous that defendant provided no means of rescue and that the bathers were left to shift for themselves. The negligence found in this case was similar in many respects to the negligence admitted in the case at bar. The Utah Supreme Court held that the jury having found adversely to the defendant on these issues of fact concerning defendant's negligence as well as other issues of fact presented to the jury,

that the verdict of the jury should not be disturbed, there being ample evidence in the record to support the verdict. The court inferentially found that the jury could find that the acts of negligence specified aforesaid could have been the proximate cause of the death of the son of plaintiff.

Other cases holding that defendant's negligence and the proximate cause of the death of decedent are for the jury's determination are Brotherton v. Manhattan Beach Improv. Co., 50 Neb. 214, 69 N.W. 757; Dinnihan v. Lake Ontario Beach Imp. Co., 8 App.Div. 509, 40 N.Y.S. 764.

Earlier in this opinion we said that some of the cases hold as a matter of law that defendant's negligence was not the proximate cause of the drowning. However, it should be observed that the circumstances of the drowning were different in many of those cases. In those cases there was no evidence to indicate the circumstances surrounding the death and how the decedent happened to drown. The body of the deceased was found in the water and there was no evidence that the deceased was in difficulty or needed assistance. In other words the evidence showed that the presence of lifeguards and rescue equipment would in no way have saved the life of the decedent. No one was aware of the need of assistance. This distinction in the circumstances of the drowning has been observed in some of the cases.

In the case of Mullen v. Russworm, 169 Tenn. 650, 90 S.W.2d 530, the decedent was a boy 12 years of age who could not swim. He was accompanied to the swimming pool by his brother and two other boys. In discussing the boy's death the court pointed out that there was nothing in the evidence to indicate the circumstances attendant upon his death and how he happened to be drowned. Also, there was no evidence to show in what portion of the pool he drowned. The court cited many cases holding that a proprietor of a bathing resort or swimming pool should provide a sufficient number of competent attendants to supervise the bathers and rescue any of the bathers apparently in danger or distress. In observing the difference in the circumstances of the drownings in these cases and the case it had for consideration the court said:

"Such is doubtless the law. In such of the foregoing cases as liability was adjudged, *the bathers were in obvious difficulties before they were drowned.* In two of the cases the danger of the bathers was particularly called to the attention of the owners of the establishments before they were drowned, but there were no guards to go to the rescue. In other words, in all these cases, there was a causal connection between the negligence of the proprietors and the death of their patrons." (Emphasis ours.) 90 S.W.2d loc. cit. 532.

The court ruled that the evidence did not show that the death of the boy proximately resulted from either the negligent acts or omissions charged against the defendants.

In the case of Hahn v. Perkins, 228 N.C. 727, 46 S.E.2d 854, the court held that there was no showing that defendant's negligence was the proximate cause of death, pointing out that the witnesses were unable to account for the disappearance of the deceased boy and that the evidence failed to reveal where or when he died.

■ In the case before us Dennis McFarland was observed struggling in the water and was heard to make three cries for help. After he shouted for help, his peril was obvious, and thereafter, defendant owed him the duty of providing reasonable means of rescue through lifeguards stationed close to the deep water and boats and equipment that would have made rescue probable. To say that the rescue of Dennis would have been a matter of speculation under such circumstances is to ignore the many occasions when persons have been saved from drowning by lifeguards or through available boats and other

rescue equipment. We believe that the jury could have found that if the lifeguards were present or the boat or other rescue equipment was immediately available that the life of Dennis would have been saved.

■ We cannot say as a matter of law that the negligence of the defendant was not the proximate cause of the death of Dennis McFarland. It is our opinion that reasonable minds could differ on this question and, therefore, under the law, it was an issue in the case that had to be determined by the jury.

The next and final point relied on by the defendant is that plaintiffs' son, Dennis, was guilty of contributory negligence as a matter of law. Defendant contends that the evidence supports his position in this regard and that the trial court erred in failing to direct a verdict for him at the close of the evidence and in failing to set aside the verdict and enter judgment for defendant. We are of the opinion that defendant is correct in this contention.

■■ The evidence shows that Dennis was a normal, intelligent and industrious boy who was approaching his fifteenth birthday. He certainly knew his ability as a swimmer and fully understood the danger of swimming in deep water. This knowledge on his part was manifested when he told his companions that "he couldn't make it" across the lake. Reasonable men could not differ on the meaning of this statement made by Dennis when one of his companions suggested swimming across the lake. This statement clearly demonstrates that Dennis was aware that the water was deep at some places on the way across the lake and that there was the danger of drowning if he did not make it across. The danger involved in swimming across the lake was fully appreciated by Dennis. Nevertheless, despite this obvious knowledge and appreciation of the danger involved, he deliberately risked his life and ventured into the deep water. In so doing

he was guilty of contributory negligence as a matter of law. Reasonable men could not differ on whether Dennis possessed a knowledge and appreciation of the danger involved. No other meaning can be taken from his statement that "he couldn't make it."

It was the duty of Dennis to exercise ordinary care for his own safety and to avoid dangers he knew and appreciated. Under the law, if he voluntarily exposed himself to the known and appreciated danger of drowning, plaintiffs are barred from recovery for his death. This rule of law is applicable despite the youthfulness of Dennis McFarland.

The evidence in the case of Van Alst v. Kansas City, 239 Mo.App. 346, 186 S.W.2d 762, showed that the drowned youth was a boy 14 years and 5 months of age. He was a healthy and intelligent lad and according to his father he could swim. On the occasion of his death the boy was told by his companions that he had better not go in the water, because they thought he could not swim. He said he could swim and that he would prove it. He removed his clothing, dived in the water and, thereafter, he called for help, sank and was drowned. The pond in which he met his death was within the corporate limits of Kansas City, Missouri, in a residential neighborhood. Plaintiffs based their claim for damages on the attractive nuisance doctrine. The defendant contended that it was not liable because deceased was guilty of contributory negligence as a matter of law. This contention of the defendant was sustained. In holding that the youth was contributorily negligent the court said:

> "The evidence in this case is undisputed and to the effect that deceased was more than 14 years of age, was a normal, healthy boy, bright and intelligent, was making average grades in school work, and had been warned by his father of the danger of swimming anywhere unless his father were present. There was no latent or concealed

dangers. The danger of drowning in water was known by him as well as if he had been adult. Such danger was plain and obvious." 186 S.W.2d loc. cit. 766.

The court held that defendant was absolved from liability because of the negligence of the deceased boy. In so holding the court relied on the case of McGee v. Wabash R. Co., 214 Mo. 530, loc. cit. 546, 114 S.W. 33, loc. cit. 37, wherein the Supreme Court held in an opinion by Judge Lamm that a 13 year old boy was guilty of contributory negligence as a matter of law in going on a railroad track in front of an approaching train. The court said:

"* * * If the facts are few and simple, devoid of confusion and complications, and if the danger to be avoided is so apparent as to be within the easy comprehension of a boy of 13 years of age, if that boy is shown to be of bright intelligence and of a judgment training him to caution and care in the matter in hand, we say, all these things being admitted, then there is no reason why the judge on the bench may not as a matter of law under the facts of the given case declare there could be no two opinions among reasonable men about the negligence of such a boy, measured by the standard of an ordinarily prudent boy."

The fact that the place in which the Van Alst boy was drowned was not a bathing place where the public was invited does not alter the applicable law. It makes no difference whether the decedent was an invitee or a trespasser. The test is the same in either instance. In either case if the decedent had knowledge and appreciation of the danger involved, and notwithstanding, entered into the danger, then he is guilty of contributory negligence as a matter of law.

In the case of Turner v. City of Moberly, 224 Mo.App. 683, 26 S.W.2d 997, a boy past 14 years of age, while attending a picnic, swung out over the water of a lake by means of a rope. In doing this he was imitating other boys who were also swinging on the rope over the water. He could not swim. He lost his hold on the rope, fell into the water and drowned. The court held that deceased was guilty of contributory negligence as a matter of law. The court said:

"* * * In this case, the evidence fully disclosed what Cecil Turner did. There is nothing to indicate that he did not fully appreciate the fact that 'fire will burn, a wasp sting, water drown or a locomotive kill, or cold freeze.' He was warned to stay away from the lake, and the jury cannot be permitted to infer that he swung out over the water because he did not comprehend the danger. On the contrary, the inference is very strong that he attempted to perform the feat because it was dangerous, and because he wanted to maintain a reputation for daring which would not be dimmed by the feats performed by the other boys." 26 S.W.2d loc. cit. 999.

It was pointed out in the case of Massie v. Copeland, 149 Tex. 319, 233 S.W.2d 449, that the statutes of the State of Texas recognized the maturity and discretion of fourteen year old children, when they were permitted under the statutes to select their own guardian and after passing a driver training course were permitted to engage in the serious and dangerous practice of operating an automobile on the public highways and city streets. In that case a normal, healthy and robust boy who had just passed his fourteenth birthday drowned and the court denied the right to recover for his death, holding that the facts as pleaded showed him guilty of contributory negligence as a matter of law.

In the case of the City of Menard v. Coats, Tex.Civ.App., 60 S.W.2d 831, a boy ten years old injured while swimming was held guilty of contributory negligence.

Plaintiffs in support of their position that Dennis was not negligent as a matter of law cite among other authorities the case of Perkins v. Byrnes, supra. In that case decedent met his death when a strong undercurrent swept him off his feet. There was evidence from which a jury could have found that the deceased was unaware of this undercurrent and had no appreciation or knowledge of the danger that confronted him. Obviously, the facts distinguish this case from the aforesaid cases on which we rely. The other cases cited by plaintiffs have been examined and found inapplicable.

It is our opinion that reasonable minds could draw no other conclusion from the facts in this case than that Dennis was fully aware of the danger of drowning when he attempted to swim across the lake in the deep water. His drowning was indeed distressing and unfortunate, but the court's duty must be exercised without the influence of its sympathy. The trial court should have sustained defendant's motion for a directed verdict.

The judgment appealed from should be reversed. It is so ordered.

MATTHES and ANDERSON, JJ., concur.

### On Motion for Rehearing or Transfer to Supreme Court

RUDDY, Presiding Judge.

In respondents' (plaintiffs') motion for rehearing they have raised two contentions that we think should be answered. In the first of these contentions they allege that our opinion assumes that Dennis McFarland was actually attempting to swim across the lake. They further allege that it is not known what the deceased was attempting to do and for this reason it should not have been assumed that Dennis McFarland was attempting to swim across the lake.

In our opinion we pointed out that plaintiffs' petition alleged that their minor son attempted to follow some of his companions who had swum across the lake. More specifically the allegation in the petition is as follows:

"* * * that shortly after entering said lake, the companions of said Dennis McFarland swam across said lake at a point where said lake was approximately 250 to 300 yards wide; *that said Dennis McFarland thereupon attempted to follow his said companions* and that as a direct and proximate result of the carelessness and negligence of the defendants, said Dennis McFarland did drown." (Emphasis added.)

It is obvious from this allegation that plaintiffs' theory of recovery was based on the fact that Dennis McFarland was attempting to swim across the lake.

Respondents (plaintiffs) in their statement, brief and argument, when stating the substance of the pleadings, said that plaintiffs' petition alleged, "* * * the deceased changed into swimming clothes and entered the water and shortly thereafter drowned *while attempting to swim across the lake.*"

The evidence shows that the case was tried in the Circuit Court on the theory that Dennis McFarland was attempting to swim across the lake when he drowned.

The briefs filed were predicated on the same theory. Proof of this is contained in the following statements taken from Respondents' Brief:

(Page 14) "Before Dennis drowned that day, at least seven (7) boys had swum across the lake. Two (2) had been across before the group with Dennis started (Tr. 160). It was just a question of who would be the first to get into trouble in this lake."

(Page 23) "On the day in question, the deceased was with boys all older than himself. * * * It was natural for him to think that he could swim the lake if he saw the other boys swim

across. A statement that he might have made 10 minutes before would not properly reflect the boy's thoughts after he saw the other boys swim across. Consider also the fact that the lake was longer than it looked. \* \* \* Had Dennis known how far it was across the lake, he would be alive today. It is probable that had the other boys been warned and advised of the distance, they, too, would not have ventured across and Dennis would not have changed his mind. But they were not warned and *Dennis did change his mind* and as a result drowned. *The decision that Dennis McFarland made to swim across,* after seeing the other boys swim across the lake, was an error in judgment made by a child, \* \* \*." (Emphasis added.)

These statements contained in respondents' (plaintiffs') brief clearly demonstrate that they assumed Dennis was attempting to swim across the lake. The whole case, from the filing of the petition in the trial court to the briefs filed on appeal, was based on the theory that Dennis met his death while attempting to swim across the lake. This new contention, wholly inconsistent with respondents' theory throughout the trial and in this court and appearing for the first time in respondents' motion for rehearing, must be ruled against them.

■ The second contention of respondents is that Dennis could not be guilty of contributory negligence as a matter of law because plaintiffs were guilty of willful and wanton negligence in failing to maintain any type of life-saving equipment or personnel on and at the lake. This charge that defendants are guilty of willful and wanton negligence is made for the first time in respondents' motion for rehearing. No allegation of willful and wanton negligence is contained in the petition. No such issue was submitted to the jury in the Circuit Court and no such contention was made by respondents in their brief in this court.

Respondents rely on the case of Stewart v. Farley, 364 Mo. 921, 269 S.W.2d 896, wherein the Supreme Court holds that where a defendant's willful misconduct has been established, the plaintiff's contributory negligence is no defense to the action. In the aforesaid case the theory of plaintiff's action as set forth in the instructions was that defendant Farley was guilty of willful and wanton misconduct in the operation of his automobile. Thus, we see, that the issue of defendant's willful and wanton negligence was presented in the trial court. In the instant case no such issue was pleaded or submitted to the jury and was not urged by respondents in their briefs in this court. The aforesaid statement is not to hold that we think the specifications of negligence alleged in the petition and submitted to the jury in the trial court were such from which the jury could find willful and wanton negligence. We do not rule that question. We do rule that the issue was not presented in the petition, in the instructions to the jury in the trial court, or in the briefs in this court. Its appearance in the Motion for Rehearing comes too late. This contention must be ruled against respondents.

The motion for rehearing or transfer to the Supreme Court is overruled in all respects.

MATTHES and ANDERSON, JJ., concur.