TEXAS & N. O. R. CO. et al. v. W. A.
KELSO BUILDING MATERIAL
CO., Inc.

No. 12412.

Court of Civil Appeals of Texas.
Galveston.

June 12, 1952.

Rehearing Denied July 10, 1952.

Wigley, McLeod, Mills & Shirley, of Galveston, and Baker, Botts, Andrews & Parish, of Houston, of counsel; V. W. McLeod, of Galveston, and J. Curtiss Brown, Joe G. Fender, both of Houston, attorneys, for appellants.

Cyril J. Smith, of Houston, for appellee.

CODY, Justice.

This was a consolidated suit by appellee, a shipper, to recover from appellants, Texas & New Orleans Railroad Company and the Gulf, Colorado & Santa Fe Railway Company, overcharges alleged to have been collected by them respectively on numerous carload shipments of sand, transported from Eagle Lake to Galveston, Texas. Each such shipment was consigned and delivered to appellee at one of its two plants located, for consignment purposes, on the tracks of the Galveston Wharves, a switching or terminal railroad line at Galveston. Each such shipment on which overcharges were claimed was transported over the line of the appellants, from whom such alleged overcharges were claimed, from Eagle Lake to Galveston and there turned over by the appellants respectively to its connecting carrier, the Galveston Wharves, and by the Galveston Wharves delivered to appellee at one of its plants, aforesaid.

The appellants collected on said shipments a mileage rate of 90¢ per ton of 2,000 pounds for said carload shipments of sand. Said mileage rate of 90¢ covered (or, as the parlance of the trade has it, *absorbed*) the switching charges for switching services at Galveston. Appellee, however, contends that the only rate which could have been lawfully collected by appellants was a specific point-to-point commodity rate from the point of origin to the ultimate destination of said shipments, to-wit: to appellee's plants on the Galveston Wharves; that said rate so prescribed for application to such shipments by the Railroad Commission was 86¢ per ton of 2,000 pounds for said carload shipments; and that hidden in or covered by the said rate of 86¢ was the shipping charges prescribed for Galveston Wharves for moving each carload shipment from its connecting carrier to the ultimate destination on Galveston Wharves.

It thus appears that this suit raises a question of the interpretation or construction of tariffs of the Texas Railroad Commission to determine the rate lawfully applicable to said shipments. The case was tried without aid of a jury upon detailed written stipulations of the parties and upon the testimony of two expert railroad rate witnesses, one testifying for appellants, the other testifying for appellee. The court rendered judgment for appellee against appellants for the overcharges so sued for by appellee. The amount of the judgment recovered against appellant, T. & N. O. was $1,916.95, while the amount recovered against appellant, G. C. & S. F. was $676.70. Appellee additionally recovered interest and attorneys' fees from appellants.

Appellants predicate their appeal upon two points, reading:

"First Point—The judgment of the trial court should be reversed and rendered because Railroad Freight Circular 12455 which is the only tariff of record authorizing a rate less than collected does not apply without addition of switching charges.

"Second Point—On the uncontroverted and undisputed evidence this court should reverse and render for appellants because the 90¢ mileage rate

with absorption of switching was the only lawful rate that could have been collected."

Railroad Freight Circular No. 12455, referred to in appellants' first point, was adopted by the Railroad Commission, as is expressly recited in said order, to enable railroads to meet the competition of barge service on sand produced in the San Jacinto River. The order names various points of origin, none of which need be given except Eagle Lake. So far as here-material, said order reads:

"Order

"Austin, Texas, January 26, 1939

"It is ordered by the Railroad Commission of Texas that Commodity Tariff No. 9–D, heretofore issued by it, be and the same is hereby amended by adding to Section 6 of Tariff, the following item:

| Item No. | Commodity | From | To | Rates |
|---|---|---|---|---|
| | Sand, carloads, minimum weight as provided in Item No. 15, Section 2 of Tariff (See Notes 1 and 2) | Eagle Lake | Galveston | 86 |

361 Note 2—Switching charges of lines other than line haul carrier at origin or destination will not be absorbed, but will be in addition to the rate provided herein and paid by shipper or consignee."

It is contended by appellants that the provisions of Note 2 of Circular 12455 must be construed as expressing the intention on the part of the Railroad Commission that the charges for the switching services rendered by Galveston Wharves over its tracks is not included in the 86¢ rate which the shipper is required to pay the line haul carrier for transportation of a shipment from Eagle Lake to Galveston but that the switching charges of the Galveston Wharves must be paid by the shipper or consignee. If Circular 12455 stood alone, much might be said in support of such construction contended for by appellants. It is well settled that the legislative function of fixing rates for common carriers has been delegated to the Railroad Commission and that its rules and regulations in reference to such rates have the same force and effect as do statutes; and that in construing rules and rate orders which have been adopted by the Commission the courts will apply the same rules of construction as are applied to legislative acts and that when the intent of the Commission as expressed in the rule or order is ascertained, it should control. Texarkana & Ft. S. Ry. Co. v. Houston Gas & Fuel Co., 121 Tex. 594, 51 S.W.2d 284. In the cited case the court pointed out the different manner in which rates were adopted by the Railroad Commission and by the I. C. C., which resulted in the different rules being applied to the construction of interstate rates whereby they were strictly construed against the carrier and the manner by which the State rates were adopted which has resulted, as stated above, in the rules of statutory construction being resorted to to determine the Commission's intentions as manifested by said rules and rates.

We will later take up statutory construction, as applied to Circular 12455, to determine what the Commission intended by Note 2 subjoined thereto. At this point it is essential to call attention to Circular 3518, which provides, "1. All rates shall, except in cases where they are specifically provided for application between given points, be determined by the mileage rates of routes of railroads between shipping point and destination." The date of this circular was in 1910. The necessary effect of Circular 3518 is to make a commodity point-to-point rate the sole lawful rate that can be applied to the shipment of said commodity from the stated point to point. That is to say, the specific rate takes precedence

over the mileage rate and the mileage rate, which is so superseded, cannot lawfully apply. Appellants' rate expert admitted that he knew of no tariff authority for applying the lower of two rates produced under a mileage scale versus point-to-point tariff. That being true, the 90¢ mileage rate applied by appellants was not a lawful rate to be applied to the shipments in question. The mileage rate of 90¢, therefore, was not an alternative rate that could be applied in lieu of the point-to-point rate, no matter how benevolent the motives of the carriers may have been in so applying said rate in lieu of the rate prescribed by Circular 12455.

In other words, whatever construction the language used in Circular 12455 requires to be placed thereon, the rate thereby prescribed must, in all events, be applied to the shipments.

The switching charges which had to be paid Galveston Wharves under the Commission's tariff, being prescribed by Circular 7613, was $7.56 per carload. Consequently, if the construction contended for by appellants is the correct one, there must be added the switching charge of $7.56 per carload to the 86¢ rate. If the construction contended for by the appellees is correct, the 86¢ rate covers the charges of the Galveston Wharves. There can be no middle ground as there is no tariff authority of the Railroad Commission for any other rate since the order of the Commission prescribing the point-to-point commodity rate made it unlawful for the carriers to assess the mileage rate.

■ Prior to the adoption by the Railroad Commission of Circular 12455 the Commission had adopted Circular 401, which became effective on April 8, 1897. The said circular provides, "All * * * rates which it [the Commission] shall hereafter adopt * * * between the City of Galveston and other points in the State of Texas, shall apply and be in force from and to all points of shipment and delivery * * * in the City of Galveston reached by the line of each railroad company entering the City of Galveston, either with its own tracks or in connection with the tracks of the Galveston Wharf Company." Said grouping or equalization order does not include all points to which shipments may be delivered in Galveston. For instance, if a shipment moved into Galveston by the Santa Fe destined to a point on the T. & N. O., Circular 401 would not apply and a switching charge would have to be additionally assessed against the shipper to pay for the transportation of the shipment over to the point on the line haul carrier which had not transported the shipment into the City of Galveston. But under and by force of said equalization order, the contract which a shipper enters into with the Santa Fe to transport a shipment into Galveston, whether destined to an industry on its own tracks or on the tracks of the Galveston Wharves, obligates the shipper to pay, and the Santa Fe to receive, the same identical rate whether the shipment was destined to a point on the Santa Fe or to a point on the Galveston Wharves. The same result applies to a shipment transported into Galveston by the T. & N. O., whether same is destined to a point on its own tracks or to a point on Galveston Wharves' tracks. But, under said equalization order, if a shipment is brought into Galveston by the T. & N. O. but destined for delivery upon the tracks of the Santa Fe or any other line haul railroad in Galveston, no equalization is effected by Circular 401 and the shipper would be required to pay additional switching charges.

The rate expert for appellee testified, and his testimony stands undisputed, that freight rate equalization of both origins and destinations is a basic factor of our state and national economy; that the shipper is more interested in the relationship of his rates with those of his competitors than he is in the actual rate since freight charges are passed on to the consumer; and that it is the inequality between competitors which gives one an advantage and another a disadvantage and that when an equalization or grouping of rates is once established, industry and business locate, develop and adjust accordingly. So that, when a Commission has once established an equalization such equalization cannot be modified lightly or without hardship to some of the shippers. That Commissions seldom dis-

turb an established equalization such as was effected by Circular 401, even upon hearing and full study and consideration. Appellants' rate expert conceded that he knew of no commodity other than gravel and sand (which are the commodities covered by Circlar 12455) on which rates to points on Galveston Wharves were not equalized with rates prescribed to Galveston. This alleged exception appellants base solely on their construction of Note 2 of said Circular.

Circular 12455 does not in terms purport to repeal Circular 401. It is a well established rule of statutory construction that repeal of statutes by implication is never favored nor presumed; that where there is no express repeal, the presumption is that in enacting a new law the Legislature intended the old statute to remain in operation. So, a repeal by implication will be adjudged only when such result is inevitable or was plainly intended by the Legislature. Further, the doctrine of implied repeal may not be invoked merely because of inconsistency or repugnance between earlier and later legislation. The court will endeavor to harmonize and reconcile the various provisions and if both acts can stand together, the rule is to let them stand. 39 Tex.Jur., page 140 et seq. "The purpose of the in pari materia rule of construction is to carry out the full legislative intent, by giving effect to all laws and provisions bearing upon the same subject." Id. page 256.

Applying these rules of statutory construction, we must conclude that the Railroad Commission did not insert Note 2 into Circular 12455 for the purpose of revoking Circular 401, but to make clear that the purpose and intention was to preserve the integrity of said Order 401. In other words, the intention to be gathered from said Note is that the shipper is to pay additional switching charges when the switching service involves moving the shipment from the tracks of one line haul carrier to the tracks of another line haul carrier.

It will be noted that Note 2 to Circular 12455 reads, "Switching charges of lines other than line haul carrier at origin or destination will not be absorbed, but will be in addition to the rate provided herein and paid by shipper or consignee." With respect to the word "line", as used in said Note, appellee's rate expert testified, and his testimony was not disputed, that in common transportation parlance "line" is used to refer to a line haul railroad and if it was intended to refer to a terminal or switching line, the full term "terminal" or "Switching line" would be used. We apply another rule of statutory construction, namely, that where a word is used in a statute, it should usually be construed in its ordinary rather than in its technical sense. "But when a term unknown to the law has a peculiar or technical meaning as applied to some art, science or trade, the court will look to the particular art, science or trade from which it was taken in order to ascertain its proper signification. In this connection, the Revised Statutes (art. 10, subd. 1) provide that 'words of art or words connected with a particular trade or subject matter * * * shall have the signification attached to them by experts in such art or trade, with reference to such subject matter.' " 39 Tex.Jur. 199.

If we are right in holding that the specific point-to-point rate prescribed by Circular 12455 must prevail over the general mileage rate which appellants applied to the shipment, it would seem clear that the Railroad Commission intended the equalization of points on Galveston Wharves with Galveston to apply. Otherwise, the general mileage rate would better serve the purpose of giving the railroads a stronger competitive position, at least with respect to points on Galveston Wharves, against barge transportation. It is not perceived why the Commission should intend to discriminate against consignees located on Galveston Wharves, and in favor of consignees located on the tracks of the carriers which have transported specific shipments of sand into Galveston. In addition, the language of Circular 401 compels such equalization.

It was undisputed that at the time Circular 401 was adopted the Galveston Wharves had no equipment with which it could perform switching services and that said switching line did not begin to render switching services until 1907. If the carriers deemed that this fact entitled them to

have Circular 401 modified, they could, of course, apply to the Railroad Commission for such relief. This, as indicated above, has never been done.

We deem it unnecessary to prolong further this opinion, and hold that the court correctly held that the lawful rate applicable to said shipment from point of origin to point of destination on Galveston Wharves was 86¢ per ton.

The judgment of the court is in all things affirmed.