Argued March 21, affirmed April 11, 1956

# SOUTHERN PACIFIC CO. *v.* BROWN ET AL

295 P. 2d 861

*Roy C. Atchison,* Assistant Attorney General, Portland, argued the cause for appellants. With him on the brief were Robert Y. Thornton, Attorney General, Salem; Kenneth E. Brown, District Attorney, Salem; and Gerald C. Knapp, Assistant Attorney General, Portland.

*Oglesby H. Young,* Portland, argued the cause for respondent. On the brief were Koerner, Young, McColloch & Dezendorf and Joseph Larkin, Portland.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, BRAND and PERRY, Justices.

TOOZE, J.

This is a suit for a declaratory judgment to determine the meaning of § 113-613, OCLA (ORS 764.150), brought by Southern Pacific Company, a corporation, as plaintiff, against Kenneth E. Brown, district attorney for Marion county, Oregon, successor in interest to Edward W. Stadter, Jr., and Norman O. Nilsen, labor commissioner of the state of Oregon, successor in interest to William E. Kimsey, as defendants. From a decree in favor of plaintiff, defendants appeal.

Section 113-613, OCLA (ORS 764.150), provides:

"(1) No person owning, controlling or operating any line of railroad in this state shall build, construct, reconstruct or repair railroad car equipment or motive power in the state without first erecting and maintaining at every division terminal, or other point where five employes or more are regularly employed on such work, a shed over a sufficient portion of the tracks used for such work, so as to provide that all men regularly employed in such work are sheltered and protected from rain and other inclement weather.

"(2) This section does not apply at points where less than five men are regularly employed in such work, nor at points where it is necessary to make *light repairs* only on equipment or motive power, nor to equipment loaded with time or perishable freight, nor to equipment when trains are being held for the movement of equipment. As used in this subsection, *'light repairs'* does not include repairs usually made in roundhouse, shop or shed upon well-equipped railroads." (Italics ours.)

Plaintiff is a Delaware corporation authorized to do business and doing business as a railroad corporation within the state of Oregon. It operates a well-equipped railroad, conducting a part of its operations at Salem, in Marion county, Oregon. In connection

with its business at Salem, plaintiff employs workmen who, in the capacities of lead machinist, machinist, machinist's helper and electrician, perform certain types of repair work on locomotives. An average of nine locomotives work in and out of the Salem yards. When the suit was commenced, some of those locomotives were steam powered, but as of January 23, 1955, all steam locomotives were removed from service, and all rolling stock of plaintiff on the entire Portland division (extending from Portland in a southeasterly direction to Crescent Lake and southerly to Ashland) is now moved by diesel power. That includes the locomotives working in and out of the Salem yard.

Plaintiff maintains no roundhouse at Salem. A substantial part of the repair work on locomotives at that place is done in the open, except that part of the work is done in locomotive cabs or in pits under locomotives, and except further that adjoining the tracks on which work is performed there are shelter sheds in which are located and stored certain mechanical tools and in which some items of work are performed. All tools used by locomotive repairmen in the open are in the category of hand tools. More than five men are regularly employed in the Salem yard.

The greater portion of the open yard work performed by plaintiff's employes at Salem consists of servicing operations on locomotives, a type of work to which the above statute has no application. The remaining portion of the work at said place consists of minimum repairs made to keep locomotives in operating condition and in compliance with the regulations of the Interstate Commerce Commission, in the making of which repairs only portable hand tools are used and only short and intermittent periods of work are involved.

Prior to trial the parties entered into a written stipulation in which are set forth 24 different items of repair work and inspection performed at the Salem yard. It would unnecessarily extend this opinion to quote the stipulation as a part hereof. It is a matter of record in the case.

Plaintiff maintains complete roundhouse and shop facilities at its Brooklyn yard in Portland, and in Eugene. Those places are fully equipped to perform all major repairs on locomotives; in fact, they are equipped to take a locomotive fully part and put it together again. However, many of the repairs to locomotives such as are performed in the Salem yard are often performed in the open at the Brooklyn and Eugene yards, although they are also performed under cover in connection with major repairs.

Plaintiff called as witnesses three expert railroad men who testified that all the repairs mentioned in the stipulation were deemed "light repairs" within railroad parlance. Defendant called one witness, an expert employed at the Brooklyn yard, who testified that the several repairs mentioned in the stipulation were what he called "running repairs," and that they were at times performed under cover at the Brooklyn yard, although at other times they were performed in the open. He admitted that "running repairs" and "light repairs" meant the same thing.

Mr. C. P. Davis, now retired, but formerly roundhouse foreman at the Salem yard, defined what is meant by the term "light repairs." He testified on direct examination as follows:

"Q Mr. Davis, is the term light repairs a term that is understood in the work of repairing locomotives?

"A Yes, sir.

"Q What does that term in railroad language mean?

"A The minimum repairs necessary to keep a locomotive in operating condition and in compliance with the I.C.C. regulations, and in performing that work small hand tools are used and the work is performed at intermittent periods of time.

"Q And ordinarily is the time required for that kind of work a long period or short periods?

"A Short periods.

"Q Do the periods of time that you have designated with respect to the items in this stipulation illustrate what you mean by the length of time ordinarily required for light repairs?

"A Well, ordinarily if a man had a boiler check to grind, as stated before, if he just had to grind it, it would take up to 30 minutes, but if he had to remove the goose-neck it would take longer.

"Q Well, you testified as to the average length of time required to do these items of work specified in the stipulation; will you inform the Court if the periods of time you have indicated there would illustrate the amount of time normally required for light repairs?

"A Yes, it would.

"Q Now referring to the stipulation again and to each of the items of repair work to which I have called your attention, will you state to the Court whether or not these items are what are known as light repairs?

"A Those items are what is known as light repairs."

Mr. W. O. Brown, master mechanic of the Portland division of the plaintiff railroad company, testified as follows:

"Q Are you familiar with the term used in railroad language of 'light repairs'?

"A Yes, sir.

"Q What are light repairs as understood by railroad men?

"A Light repairs are repairs necessary to keep a locomotive in compliance with the I.C.C. requirements and laws, and it has a definite indication to me to be the minimum repairs necessary to keep a locomotive in operating condition, and for that type of work only hand tools are used, and the work is usually of short duration and intermittent in its continuity."

As ordinarily understood a "roundhouse" is a circular building for housing and repairing locomotives, and it is so understood in railroad parlance. However, railroad men also speak of any place where mechanics are employed and repair work is done as a "roundhouse." This is pointed out in the testimony of the witness Brown. He testified:

"THE COURT: All right. The witness said there is some type of roundhouse in Salem and that is the reason I wanted to know what a roundhouse was.

"A Perhaps my shop jargon is confusing.

"THE COURT: The statute uses the word 'roundhouse'—

"A It is an engine terminal where locomotives are maintained, but in my jargon it refers to any place where you have mechanical forces.

"THE COURT: Your use of the term, for work done at Salem is work usually done in roundhouses?

"A Yes, sir, the work done at Salem is also done at any other roundhouse on the Southern Pacific.

"THE COURT: Any other roundhouse?

"A Sir?

"THE COURT: It is done at any other roundhouse?

"A Yes, at any roundhouse—Brooklyn, Eugene, Roseburg.

"THE COURT: The type of work that is usually done in roundhouses?

"A The work is done in connection with all these other repairs.

"THE COURT: All right.

"Q There is I believe out here at the locomotive yard a sign saying 'roundhouse'?

"A Perhaps so.

"Q Is that intended to designate one of these semicircular buildings the locomotives go into?

"A It is a figure of speech; if it is intended that way it is a misnomer.

"Q What is your understanding of whether or not there is any equipment here at Salem which is considered as being a roundhouse in the sense that you have described the roundhouses at Brooklyn or Eugene?

"A A roundhouse to me is a round house, it is a peculiar shape; it is intended to house a locomotive if it is a roundhouse.

"Q There is no such thing here at Salem?

"A No sir.

"Q And the others that you mentioned are modified structures in relation to the ones at Eugene and Brooklyn?

"A Yes."

The sole question for decision is what is meant by the term "light repairs" as used in the statute. Defendants contend first that the term applies only to emergency repairs, and secondly, that the work performed at Salem cannot be considered light repairs because the same work is at times performed in the roundhouse, shop or shed, both at Portland and in Eugene. In support of their latter contention defendants point out that the statute specifically provides as follows: "The term 'light repairs,' as herein used, shall not include repairs *usually* made in roundhouse,

shop or shed upon well-equipped railroads." (Italics ours.) It is claimed that by this provision the statute expressly defines and limits the term "light repairs."

■■ Reading the statute as a whole, it is manifest therefrom that in using the terms "roundhouse, shop or shed," the legislature had in mind a circular building and shops where locomotives are housed and major repairs are made. The word "usually" as used is a qualifying term. In speaking of the place where repairs *are usually made*, the legislature clearly intended to include such repairs only as necessarily required the heavy machinery, tools, equipment, and facilities of a roundhouse proper, in the performance thereof. The performance of "light repairs" at such a roundhouse or shop is merely incidental to the principal purposes of such establishments. Otherwise, the exception of "light repairs" from the operation of the statute would be wholly meaningless.

Under the statute there are four exceptions to its requirements, viz.:

1. At places where less than five men are regularly employed. [That exception does not apply to the Salem yard.]
2. *Where "light repairs" only are made.*
3. Where repairs are made on equipment loaded with time or perishable freight; and
4. Where trains are being held for movement of equipment.

These exceptions are separate and distinct, referring to entirely different situations. Those numbered 3 and 4 clearly contemplate emergency conditions. Under those exceptions it would be permissible, if possible, to make major repairs upon locomotives. The first exception is an arbitrary one and bears no relation whatever to the nature of the repairs to be made,

whether they be considered "light" or "heavy" repairs. The second exception is in a class by itself, and whether or not the mandate of the statute is to be obeyed depends entirely upon whether or not the work done comes within the meaning of the term "light repairs."

█ In determining the meaning of any term we must consider it in the light of the situation where it is used. We must, therefore, determine what is meant by the term "light repairs" in the light of railroad parlance. How is it understood in the railroad business? Obviously, it is necessary to resort to the testimony of railroad men who know to determine the meaning of the words used. In *Union Pac. R. R. Co. v. Anderson,* 167 Or 687, 709, 120 P2d 578, Mr. Justice LUSK, in speaking for the court, quoted with approval from *Himrod Coal Co. v. Stevens,* 104 Ill App 639, 644, the following:

"Where a statute regulating the manner of conducting a certain industry is ambiguous or indefinite, courts will receive as an aid to proper interpretation the construction which practical persons engaged in the industry generally place upon it."

■ The term "light repairs" as used in the statute under consideration, from the standpoint of common understanding, is indefinite, but it has an established meaning in the railroad business. That meaning has been clearly pointed out in the testimony of the witnesses, supra, and covers all the repair work done at Salem. Also see *State v. International & G.N. Railroad Co.,* 107 Tex 349, 179 SW 867. As to its Salem operations, plaintiff is exempt from the requirements of the statute.

The decree of the trial court is affirmed. Neither party shall recover costs.