William G. Brumm, Administrator of Estate of Robert Edward Brumm, Deceased, Plaintiff-Appellee, v. Clinton J. Goodall, Defendant-Appellant.

### Term No. 57–O–4.

Fourth District.

February 7, 1958.

Rehearing denied February 28, 1958.

Released for publication February 28, 1958.

Walker & Williams, of East St. Louis, for defendant-appellant.

Listeman & Bandy, of East St. Louis (C. E. Heiligenstein, of counsel) for plaintiff-appellee.

JUDGE BARDENS delivered the opinion of the court.

This is a wrongful death action growing out of the drowning of Robert Edward Brumm, plaintiff's intestate, a fourteen year old boy, in the Westhaven Swimming Pool which is located just south of Belleville and which is operated by the defendant as a public pool to which an admission fee is charged. The jury returned a verdict in plaintiff's favor and assessed damages at the sum of $10,000. Post trial motions were denied and this appeal follows.

Inasmuch as the contentions of the defendant on appeal go solely to the questions of whether the trial court should have directed a verdict and in the alternative whether the verdict is against the manifest

weight of the evidence, it will be necessary to detail the evidence at some length.

The Westhaven Swimming Pool operated by Defendant Goodall is 105 feet long and 45 feet wide, the length being north and south. It is surrounded by a walkway or deck about six and one half or seven feet wide. Just south of the pool is a wading pool for small children and south of the wading pool is an area 15 or 20 feet in depth where benches are placed to sit and sunbathe; a similar area is located north of the swimming pool. The entire pool area is enclosed by a fence. Entrance to the pool area is gained through the bath house located in the middle of the east side.

The water in the swimming pool ranges in depth from nine feet at the north end to three feet at the south end. There were two diving boards on the north side, the high board was approximately 10 feet above the surface of the water, and the low board is approximately four feet above the surface. There are depth markers placed on the top of the concrete wall around the pool; this wall is about 14 inches thick and five inches above the surface of the water. The depth of the water is painted with blue on a white background upon the top side of that wall or ledge with numbers eight or nine inches in height. These depth markers are not visible to a person in the water. There are no floats or ropes to mark the depth of the water. At a point 40½ feet from the north end of the pool, there are ladders on the east and west sides for bathers to get in and out. There are also ladders at the northeast and northwest corners of the pool, and one ladder in the middle of the south end of the pool. There is one lifeguard chair elevated about six feet above the deck and on the west side of the pool about 15 feet from the north end.

Defendant employed Charles Nichols as manager. Nichols was principal of a grade school in Belleville

214

and a city alderman. He was in charge of the check room and was given equal authority over the lifeguards with the owner Goodall. He had served as manager of the pool for defendant and prior owners for 13 years prior to 1955.

Neither Nichols nor defendant held certificates pertaining to life saving, but a water safety instructor, certified by the Red Cross, was employed to instruct the lifeguards employed at the pool. Both Nichols and defendant had, however, frequently seen demonstrations of life saving technique and knew how the Schaefer method and Arm Lift method of artificial respiration should be given.

Defendant had six or seven lifeguards subject to call in 1955, but the number of guards on duty at any time would be governed by the size of the crowd in the pool. All of the guards held either junior or senior life saving certificates issued by the Red Cross. There is no difference between a junior and senior certificate insofar as the physical requirements are concerned; swimming capability and life saving capability are identical; the difference is that below a certain age only junior certificates are issued and the test given is oral. For a senior certificate a written test is given although it requires no additional knowledge other than that required for a junior certificate.

The three guards on duty at the time Brumm was drowned were:

(A) Jay Nickel, then 17 years of age, who held at that time a junior life saving certificate. At that time he had completed his junior year in high school. He was graduated from high school the following year and at the time of the trial was a freshman at Washington University. He had worked in the bath house at the swimming pool since he was 15 or 16 years old, and had served as lifeguard there in the summer of 1954, and in 1955. He was not quite six feet tall and

weighed 180 pounds. He knew both the Schaefer method and Arm Lift method of artificial respiration.

(B)   Kenneth Castelli, also a student at Washington University, who was then 21 years of age and held a senior life saving certificate from the Red Cross. He was trained in both the Schaefer and Arm Lift methods of artificial respiration.

(C)   Terry Chismore, then 16 years of age, held a junior life saving certificate which he had received in 1954 when he had worked in the check room at the swimming pool, and started as lifeguard when the pool opened in 1955. He was trained in both methods of artificial respiration.

The three guards on duty at the pool that afternoon customarily rotated their positions every 20 or 30 minutes. One of the guards was seated in the elevated chair located about 15 feet south of the northwest corner of the pool. His primary responsibility was the diving boards and the deep end of the pool. Another of the guards was to walk between the ladder on the west side of the pool down to the southwest corner. His primary responsibility was the shallow end of the pool. The other guard patrolled from the southeast corner of the pool up along the east side of the pool to the ladder on the east side of the pool.

At the time of the drowning, the guard located on the chair was Jay Nickel, the guard patrolling in the southwest sector was Kenneth Castelli, the guard on the east side was Terry Chismore.

On the day in question, Mrs. Brumm had brought her son, Robert, a neighbor boy Jerry Maxwell, age 16, and her three smaller children to the Westhaven Pool to swim. They arrived about 2:15 P. M., paid their admission charges, changed into their swim suits and entered the pool area. Mrs. Brumm had been to this pool once before but her son Robert had not been there before. Mrs. Brumm told Robert and Jerry to swim

216

near the lifeguard and she stayed with her three smaller children near the southwest corner of the pool where the water was shallow. Mrs. Brumm testified that the pool was crowded; that the area at the south end was pretty well filled; that she did not notice whether the patio north of the pool was filled; that there were so many people she could not give an exact count; and that there were quite a few people in the north end where it was deeper.

Robert Brumm and his companion, Jerry Maxwell, spent most of their time swimming back and forth across the pool between the ladders located in the middle of the pool. They knew the water there was between 5 and 6 feet deep and they tried to stay in that area. They would swim from one side to the ladder on the other side, climb out of the pool, sit somewhere near the ladder until they started their swim back across to the other side. Robert knew three strokes— the dog paddle, the overhand crawl, the breast stroke— and could float face down. He weighed 105 pounds and was five feet two inches tall. His companion, Maxwell, observed that he was able to swim across the pool satisfactorily without being exhausted or out of breath.

The Brumm party planned to leave at 4:00 o'clock. As that hour approached, Maxwell testified he and Robert were on the west side of the pool near the ladder located in the middle of the pool, and decided to swim across to the east side and get out and get dressed. He dived in to swim across to the east side. He never looked back or saw Brumm enter the water. He reached the east side of the pool, had to wait momentarily while some other person ahead of him went up the ladder, and when he climbed up onto the deck, he looked around and could not locate Brumm. He stood there for about a minute looking at the faces in the water and not finding Brumm, he then walked to

217

the southwest corner of the pool where Mrs. Brumm was seated and asked her where Brumm was. She had not seen him. Mrs. Brumm then walked up to the west side of the pool looking for her boy and Maxwell walked back around to the east side of the pool and into the bath house, but did not find him in there. When he came back out he saw a crowd gathered along the east side north of the ladder and found that Brumm was there being given artificial respiration. Maxwell did not see or hear anything indicating Brumm was in trouble as he swam across but there were people talking and splashing to interfere with his hearing. There were a few divers on the high board at that time, and divers were lined up on the low board, but there were no swimmers on the west side at the point where Maxwell entered the water.

Nickel, the guard located on the chair near the northwest corner, was first notified by some unknown girl that she thought she saw something on the bottom on the east side. He immediately jumped from his chair, ran around the north side, and as he got between the two diving boards he could see a body lying on the bottom near the east wall. He dived in from that point and went down to get the boy. He found the body about six feet from the east wall and five feet north of the six-foot depth marker which would be 30 feet from the north wall. When the guard, Chismore, patrolling the east side, saw Nickel running he started to run toward the north. He dived in the water momentarily after Nickel and assisted in bringing the body to the surface. They hoisted the body up over the side of the pool at a point about 15 feet north of the ladder located between the five and six foot depth. Some man, who is otherwise unidentified, immediately took the body, turned it over on its stomach and began to give artificial respiration, using the Schaefer method. The guard, Nickel, jumped out of the water, ran

218

to the bath house and informed the manager, Charles Nichols, of the fact and immediately returned to the side of the pool where artificial respiration was being given. He observed that the artificial respiration was being given in an approved method and in satisfactory style. He first helped in keeping the crowd back and, since there were other people in the pool, he returned to guarding. The lifeguard, Chismore, also testified that a man unknown to him pulled the body up onto the deck and began administering the Schaefer method in an approved fashion, so he helped in keeping the crowd back.

Nichols, the manager, immediately called the fire department which had a resuscitator and notified the owner, Goodall, and a doctor and ambulance were called. Both Nichols and Goodall then went out to the scene and observed that the unknown person was giving artificial respiration in accordance with the Schaefer method and appeared to be doing a satisfactory job. Artificial respiration was so continued until the fire department arrived with their resuscitator which they then applied. The doctor soon appeared. After giving the boy a shot he soon pronounced the boy dead.

Nickel testified for the plaintiff that the crowd that day was an average afternoon crowd; that he had been seated on the lifeguard chair for 5 or 10 minutes when this occurrence took place; that there was a second guard on the west side of the pool patrolling from the ladder in the middle of the pool to the southwest corner and another guard on the east side patrolling from the ladder in the middle to the southeast corner; that all of the guards help one another out and their eyes roam all over the pool to see whether people need help; that it was his duty to watch the deep end; and that he could tell whether a boy was a good swimmer by seeing him swim and could tell when a boy ap-

peared to be in trouble. He said the divers and swimmers in the water did make the surface choppy so that he couldn't see the bottom of the pool too well. It was his primary duty to watch the area from the ladder to the north end of the pool, including the diving boards to be sure that people dived only off the end of the board and to see that there were no people in the water under or near the boards; that he recalls nobody swimming near the boards shortly before the girl notified him of the existence of a body on the bottom of the pool; that he was paying attention to his duties at that time and looking out over the water to see whether anyone was in danger and does not remember having warned anybody to get out of the way shortly before the girl came to him; and that the rules in force at the pool required him to keep a lookout for people who may be in trouble and people who break the rules against running, improper diving and scuffling about the sides of the pool or in the pool. Just prior to the time the girl spoke to him, he did not hear any outcry or call for help and and there was no one in the water at the north end that indicated by his actions that he was in trouble or having difficulty staying afloat.

Castelli testified for the plaintiff that at the time of the occurrence, he was patrolling on the west side of the pool from the ladder to the south end, but that it was also his duty to watch the rest of the pool; that there were people swimming in all parts of the pool and that he noticed Nickel leaving his chair; that he had been attentive to his duties just prior to the time Nickel did leave his chair and he did not hear any sound or noise or see anything to indicate that anyone was in trouble; that he dived in from the west side of the pool and by the time he reached the east side the other guards were in the process of lifting the body out of the pool; and that some man, unknown to

220

Castelli, who helped lift the body over the side of the pool stated that he would take care of the artificial respiration as he had done it often and then began applying the Schaefer method of artificial respiration. When the fire department arrived with the resuscitator this unidentified man aided in the administration of oxygen. He, Castelli, had been taught that artificial respiration should be given in normal breathing rhythm and while the newer Arm Lift method disperses more water and is a better method a break in the rhythm in changing from the Schaefer method to the new method would be dangerous.

Terry Chismore testified that it was his duty as a guard to watch for swimmers that might be in trouble and their duties required them to keep their eyes on the pool at all times; that generally one can tell from looking at a person whether he is in trouble and needs help; that he saw Nickel leave his chair at the northwest corner of the pool but prior to that he had not heard any outcry or noise indicating that anyone was in trouble, nor did he see anyone in the water that needed help. He observed the man giving the Schaefer method of artificial respiration and testified that it was being properly given. While he knew both methods he did not do anything about changing the method as he thought it would be dangerous to break the rhythm, as any loss of time is dangerous.

Herman Thomas was called by the plaintiff as a witness and testified that he was assistant athletic director of the Missouri Athletic Club in St. Louis which has a swimming pool, where he had been connected with swimming facilities for 34 years and teaches swimming to classes of boys. He has studied with reference to saving lives, was acquainted with the Schaefer method and has used that method and also knew the Arm Lift method which had been accepted for two or three years and that it will let in to the lungs

221

approximately one-third more air than the Schaefer method. This new method has been accepted by the Red Cross. It was his opinion that a boy 14 years old could be submerged for a maximum of three minutes and still have life. He said there was no reason why a change could not be made from the Schaefer method to the Arm Lift method as there would be no obstruction between the two operators and there would be no danger in changing from one method to the other.

It was his judgment that 175 people in a pool the size of the Westhaven Pool would be a crowded pool. He expressed the opinion that in such a pool there should be two guards in the deep water and that the dangerous part of the pool is from the four foot depth to the deep end. It was his opinion that the larger concentration of persons would be in the shallow end of the pool and that if swimmers were prohibited in the diving area, the concentration would be in the middle part of the pool. He further testified that after three minutes, which would be the usual limit to revive a person, there is no type of artificial respiration or resuscitation that will do any good. He further stated that the Schaefer method was used continuously from 1928 until the new method was adopted and that the Schaefer method is still widely used.

Dr. Kane, the coroner, performed an autopsy on the Brumm boy's body the day after he drowned. From an external examination, he found no marks or any evidence of trauma. He removed the lungs and found that the air spaces were filled with water. He found no evidence of disease or abnormality of any of the internal organs. He removed the scalp and found no evidence on the inside of the scalp of marks or contusions which he said frequently show up even when there is no evidence of trauma visible externally. It was the doctor's opinion that the Brumm boy died of a drowning and no other cause.

Jack Wall, superintendent of the Belleville playgrounds and swimming pool, testified that the lifeguards which he employed at the Belleville pool were usually high school or college students ranging in age from 15 on up, but they prefer guards at least 16 years of age who have passed the Red Cross Junior or Senior Life Saving test; that in his experience and observation the 16 and 17 year old lifeguards are able to perform the duties of a lifeguard and there is no reason to put older persons on lifeguard duty with a 16 year old guard who is capable. He testified that the recommendations of the Department of Health and the Red Cross is to have one lifeguard for every 75 people. The State Department also sets forth in their booklet a formula to fix the maximum capacity of people in a pool. The formula is based upon the square feet of area and different depths of water. For a pool the size of the Westhaven Pool, the maximum capacity is 354 persons.

In comparison, on the 30th day of June, 1955, the Belleville Swimming Pool conducted swimming lessons in the morning from 9:00 until 12:00, broken down into three classes of approximately 220 persons per class. From 1:00 o'clock in the afternoon until 10:00 o'clock P. M., they had 1517 swimmers and at no time during the afternoon did they have on more than five lifeguards. Wall holds the title of water safety instructor under the Red Cross and as such is authorized to teach Red Cross courses, including Junior Life Saver and Senior Life Saver, preliminary water safety courses, and issue certificates on behalf of the Red Cross. He further testified that there are 15 or 20 different types of artificial respiration, of which there are four in common use, namely, the Schaefer method, the Arm Lift method, the Holger-Mealton method and the Hip Roll method. The Hip Roll method will expel and permit a greater intake of air than does the Arm

223

Lift method. The Schaefer method was recognized in 1927 by the Red Cross and is also recommended by the Y. M. C. A. and American Telephone & Telegraph Co. The Red Cross substituted the Arm Lift method a few years ago, but both methods are recognized. The Arm Lift method displaces more air, which is important.

Marvin Voght testified for the defendant that he was 19 years old, a student at Milliken University, and that he had been employed at the Westhaven Swimming Pool as a guard for four years and held a certificate as water safety instructor from the Red Cross. He had been on guard duty with Nickel, had known him most of his life and had observed the way he performed his duties as guard, and that in his opinion Nickel performed such duties in a proper manner, being alert to his responsibility as a guard.

Plaintiff introduced into evidence as exhibit 4 a pamphlet issued and published by the American National Red Cross in the year 1953 which superseded some of the information in the "American Red Cross First Aid Text Book" and the "American Red Cross Life Saving and Water Safety Text Book." This pamphlet explained by diagrams and reading material the directions for the use of the Arm Lift method. The pamphlet also included a paragraph headed "Additional Related Directions" in which it is stated: "It is all important that artificial respiration, when needed, be started quickly. There should be a slight inclination of the body in such a way that fluid drains better from the respiratory passage. The head of the subject should be extended, not flexed forward, and the chin should not sag lest obstruction of the respiratory passages occur. A check should be made to ascertain that the tongue or foreign objects are not obstructing the passages. . . ."

■ That the defendant was under a legal duty to make reasonable provisions and to take reasonable

precautions to provide for the safety of his patrons can hardly be disputed. Decatur Amusement Park Co. v. Porter, 137 Ill. App. 448. Blue v. St. Clair Country Club, 7 Ill.2d 359, 131 N.E.2d 31, 48 A.L.R.2d 97 and note 104.

■ Defendant argues each charge of negligence separately and contends no negligence is proven and in the alternative that, if negligence is shown, there is no proof that such negligence was the proximate cause of death. We are, therefore, confronted first with the decision of whether there is no evidence in the record, considered in its aspect most favorable to plaintiff, tending to prove any negligence of the defendant nor the proximate cause of the death of the Brumm boy. Marshall v. Metropolitan Life Ins. Co., 405 Ill. 90, 90 N.E.2d 194; Shevlin v. Jackson, 5 Ill.2d 43, 124 N.E.2d 895.

The testimony of the coroner established that death resulted from drowning and that, at the time of autopsy the lungs still contained sufficient water to keep them from floating. From the evidence the jury was warranted in concluding defendant was negligent in several respects; first, that there were insufficient number of guards at the deep end of the pool (as testified by the witness Thomas) or that the guards did not keep a sufficient lookout; and, second, that the defendant's agents were negligent in permitting the whole responsibility of artificial respiration to rest upon an unidentified stranger without checking to ascertain if there was some inclination to the body of deceased to facilitate drainage and to ascertain if the tongue or some foreign substance obstructed the respiratory passage (as outlined in plaintiff's exhibit 4).

As to the proximate cause the jury were warranted in concluding that if the body of deceased was seen and recovered in apt time artificial respiration, properly administered, would normally be successful and

225

defendant's omissions in proper administration of resuscitation were the direct cause. On the other hand, if the body was not seen and recovered in apt time resuscitation efforts would be useless but defendant's omissions in failing to discover and recover the body were the direct cause.

■■ Where it is reasonable to conclude that one or another of two situations was a proximate cause and that there was a basis of negligence underlying both situations a jury finding of negligence and proximate cause thus rendered is not speculative. We conclude that the lower court was not in error in refusing to direct a verdict.

■■ As to defendant's alternative contention that the verdict was against the manifest weight of the evidence it should be noted that there was practically no conflict in the evidence on the points that we have held support the findings of negligence and proximate cause. To reverse a judgment on this alternative ground an opposite conclusion must be clearly evident. Morgan v. Mixon Motor Co., 10 Ill.App.2d 323, 137 N.E.2d 504. Olin Industries, Inc. v. Wuellner, 1 Ill.App.2d 267, 117 N.E.2d 565. Dinger v. Rudow, 13 Ill.App.2d 444, 142 N.E.2d 128. Anderson v. Launer, 13 Ill.App.2d 530, 142 N.E.2d 838. Robinson v. Workman, 15 Ill.App.2d 25, 145 N.E.2d 265.

The judgment of the lower court is affirmed.

Judgment affirmed.

CULBERTSON, P. J. and SCHEINEMAN, J., concur.