Elizabeth HARRIS, Appellant,

v.

**LAQUINTA–REDBIRD JOINT
VENTURE, Appellee.**

No. 8268.

Court of Civil Appeals of Texas,
Texarkana.

Feb. 18, 1975.

Rehearing Denied March 18, 1975.

Woodruff & Smith, Dallas, for appellant.

Bailey, Williams, Westfall & Henderson, Dallas, for appellee.

CORNELIUS, Justice.

Appellant filed suit against appellee for damages resulting from the drowning of her son, Ned Harris, in appellee's motel swimming pool. At the close of evidence from both parties the District Court directed a take nothing verdict. The parties will be referred to as in the trial court.

Plaintiff based her case upon the alleged negligence of defendant in failing to provide a lifeguard, failing to warn of the absence of a lifeguard and failing to have a life pole and a separate throwing line available as required by Dallas City Ordinance No. 8479. We have concluded that plaintiff made a case for the jury on the issues of negligence and proximate cause in failing to provide a life pole as required by the ordinance, and that the directed verdict was therefore improper.

In judging the propriety of the court's action in directing a verdict we must disregard all adverse evidence and consider only that evidence, together with all reasonable inferences properly drawn therefrom, favorable to plaintiff's case. If there was any probative evidence of negligence and proximate cause the directed verdict was improper. Since defendant elected to proceed with its evidence after plaintiff closed her case, the issue is to be decided from the evidence on the whole case rather than on plaintiff's case alone. 56 Tex.Jur.2d Trial, Sec. 220 p. 563.

The evidence, viewed most favorably to plaintiff's case, was as follows:

Ned Harris was in Dallas with his sister and other young people attending Explo '72. They were staying at defendant's motel which had a small swimming pool as part of its facilities. Several of the group, including Ned, had gone swimming there on Wednesday night without incident, and on Thursday night Ned and others again went swimming. While he was in the pool on that evening Ned encountered some difficulty and began to call for help. Two of

his companions, a boy and a girl, successively got in the water and tried to get hold of him but were unable to do so. Mr. Albuquerque, who was a guest at the motel, saw Ned struggling in the water and jumped in to attempt a rescue. By the time he got into the water, Ned had submerged and was at or near the bottom of the pool, and Albuquerque could not get to him because of the resistance of his own clothing and shoes. Albuquerque then got out and a friend of his dived in, but he was also unable to reach Ned. These two men then grabbed two aluminum poles which were nearby and used them to reach the victim. As neither pole had a hook, loop or other pulling facility on it, the men could not get "ahold" of Ned to pull or lift him out of the water, but could only push him in an attempt to move him to shallow water. After some time and considerable difficulty they finally succeeded in pushing the boy to the shallow portion of the pool where he could be reached and was pulled out of the water. Attempts to revive him failed. Albuquerque testified that because the poles had no hook or pulling facility it was difficult · to move the boy and it " . . . took some time, I don't know how much, but it took seconds or minutes to do this because the poles, of course, they are long and aluminum, and we use them to push, not to pull, because there was no way to get ahold." He further testified that if the poles had been equipped with some type of pulling device he could have effected a speedier recovery. One of the poles bent as it was used in an attempt to push Ned to the shallow area.

Ordinance No. 8479 of the City of Dallas regulating the operation of public and semipublic swimming pools, required that one unit of "safety equipment" be available at all such pools at all times the pools were in use. One unit of lifesaving equipment was defined by the ordinance as including " . . . a life pole or shepherd's crook type of pole with minimum length *handle* of twelve feet; . . . "

There was evidence that the poles which were provided at the pool were merely straight aluminum poles without any hook or pulling device. The court was therefore required to decide whether a straight pole without such a hook or pulling device was a "life pole" within the meaning of the ordinance. If it was not, the jury could have found from the evidence that the defendant violated the ordinance in failing to provide a life pole. Such a violation would be negligence per se. 40 Tex.Jur.2d Negligence, Sec. 11 p. 456; Alpine Telephone Corporation v. McCall, 143 Tex. 335, 184 S.W.2d 830 (1944). The construction of the ordinance. was a question of law to be determined by the court. 53 Tex.Jur.2d Statutes, Sec. 152 p. 219; Freels v. Walker, 120 Tex. 291, 26 S.W.2d 627 (1930, opinion adopted). The same general rules of construction which apply to statutes apply also to municipal ordinances. Reed v. City of Waco, 223 S.W.2d 247 (Tex.Civ.App. Waco 1949, writ ref'd). The prime objective in such construction is to determine the intention of the legislative body. Bolton v. Sparks, 362 S.W.2d 946 (Tex.1962). To assist in ascertaining the legislative intent resort may be had to several sources. Among these are (1) the object and purpose of the enactment and the evils sought to be prevented, 39 Tex.Jur.2d Municipal Corporations, Sec. 267, p. 594; Hargrave v. Texas & P. Ry. Co., 12 S.W.2d 1009 (Tex.Comm'n App. 1929, jdgmt. adopted); (2) the meaning of the words actually used, 53 Tex.Jur. 2d Statutes, Secs. 146, 147; and (3) the construction placed upon the enactment by the officers or agencies charged with its administration or enforcement. Calvert v. Kadane, 427 S.W.2d 605 (Tex.1968); Heard v. City of Dallas, 456 S.W.2d 440 (Tex.Civ.App. Dallas 1970, writ ref'd n. r. e.). In determining the meaning of the words used, an attempt will be made to harmonize the various provisions of the enactment, and the words will be given their usual and ordinary meaning, except that where technical words or words of a par-

ticular art, trade or activity are used they will be given the meaning recognized by persons engaged in that particular art, trade or activity. 53 Tex.Jur.2d Statutes, Sec. 150 p. 217; Hindes v. Lock, 259 S.W. 156 (Tex.Comm'n App. 1924. jdgmt. adopted); Texas & N. O. R. Co. v. Kelso Building Material Co. Inc., 250 S.W.2d 426 (Tex.Civ.App. Galveston 1952, writ ref'd n. r. e.); Vernon's Tex.Rev.Civ.Stat.Ann. art. 10. In the latter case, the testimony of persons engaged in or familiar with that art, trade or activity is admissible to explain the meaning. 82 C.J.S. Statutes Sec. 361 p. 793; Order of Railway Conductors of America v. Swan, 329 U.S. 520, 67 S.Ct. 405, 91 L.Ed. 471; Southern Pacific Company v. Brown, 207 Or. 222, 295 P.2d 861 (1956); Hillman v. Northern Wasco County People's Utility District, 213 Or. 264, 323 P.2d 664 (1958).

█ Considering first *the object and purpose of the ordinance* and the evils sought to be prevented, it is obvious that the requirements for lifesaving equipment were designed to facilitate the rescue of persons in danger of drowning. With respect to a "life pole", it is common knowledge and was confirmed by inferences from the testimony, that a pole without a pulling device is reasonably effective to rescue only those persons who are still conscious and able to grasp the pole so that others can pull them to safety; whereas, a pole with a hook or pulling device can be used to retrieve unconscious persons who may still be alive and subject to resuscitation even though they are submerged. In view of the fact that a comprehensive unit of lifesaving equipment was envisioned by the ordinance,* it seems unreasonable to suppose that the requirement would be satisfied by a pole which would be effective in the former case but not in the latter case. The phrase "life pole or shepherd's crook type of pole" surely did not mean either a pole *with* a hook or pulling device or one

*without* such a device, but rather one of either type or designation *with a pulling device*. This appears to be further illustrated by the additional phrase "with minimum length *handle* of twelve feet". If the ordinance meant a straight pole without anything else, it could have simply said "a life pole at least twelve feet in length." The use of the word "handle" seems to presuppose that there would be something more.

In considering *the meaning of the words used*, we believe the term "life pole" is not one of common parlance or usage, but was used in the ordinance in a technical sense as applied to the particular trade or activity which the ordinance regulated—the operation of a public swimming pool and the lifesaving activities relating to it. As to the meaning of the term when applied to such activity, the only testimony was from defendant's own witness, Dean Gray, who was Chief of the Water Quality Surveillance Section of the City of Dallas Health Department. Part of his duties was the inspection of swimming pools and the lifesaving equipment required by the City Ordinance. He testified that "life pole" and "shepherd's crook" were two names for the *same piece of equipment*, and that a life pole " . . . has a 'U', looks like a U-shaped end on it, looks like a shepherd's crook." To the question "When you say life pole or shepherd's crook, you're talking about one and the same thing, is that correct?", he answered "Yes, sir, . . . ". The testimony of Gray, who was familiar with the meaning of the words in the trade or business to which they applied and who was also an officer charged with the administration and enforcement of the ordinance, was entitled to weight. Heard v. City of Dallas, supra.

Since all of the aids to construction which were available to the trial court were to the same effect, we believe it was established that a "life pole" as required by

---

\* The required equipment also included a ring buoy with rope, a separate throwing line, a guard line separating the shallow and deep portions of the pool, and a telephone with selected list of numbers for ambulance, hospitals and rescue units.

the ordinance must be one equipped with a hook or other pulling device. The jury could have found from the evidence that defendant did not have such a life pole available, thus rendering defendant guilty of negligence per se.

It next becomes necessary to determine if from the evidence and inferences to be drawn therefrom, the negligence in failing to provide a life pole could have been a proximate cause of the death of Ned Harris.

In the context of this case, proximate cause would be an act or omission which caused or failed to prevent the injury. See 40 Tex.Jur.2d Negligence, Sec. 18 p. 469. It is ordinarily a fact question for the jury. In the determination of that fact question the jury is allowed broad latitude to infer proximate cause from the evidence and the circumstances surrounding an accident. Thoreson v. Thompson, 431 S.W.2d 341 (Tex.1968); Hopson v. Gulf Oil Corp., 150 Tex. 1, 237 S.W.2d 352 (Tex. 1951); Weingarten v. Brockman, 135 S. W.2d 698 (Tex.Comm'n App. 1940, opin. adopted); Peveto v. Smith, 134 Tex. 308, 133 S.W.2d 572 (1939, opin. adopted). This is especially so in drowning cases where it is not possible to produce direct proof that a person could have been rescued if a lifeguard or proper lifesaving equipment had been provided. McFarland v. Grau, 305 S.W.2d 91 (St. Louis Ct. of App., Mo. 1957); Collins v. Riverside Amusement Park Co., 61 Ariz. 135, 145 P.2d 853 (1944); City of Longmont v. Swearingen, 81 Colo. 246, 254 P. 1000 (1927).

In this case the testimony of defendant's own witness, Albuquerque, made it clear that the lack of a pole with a hook or pulling device caused a significant delay in the rescue because the poles could only be used to push the boy to the shallow portion of the pool where he could be retrieved by hand. His testimony also made it clear that the retrieval would have been quicker had the pole been equipped with a hook. The testimony also confirmed that the boy had not been submerged long when Albuquerque and his friend began to use the poles. Albuquerque first observed the boy "bobbing up and down" in the water. When Albuquerque made his unsuccessful attempt at rescue by entering the water, Ned had descended to or near the bottom of the pool. Albuquerque and his friend then got out and used the poles. Reasonable minds could infer from this evidence that, had the poles been as required by the ordinance, the boy could have been retrieved quickly enough to prevent his death. Prompt resuscitation efforts are frequently successful even though the victims have already lost consciousness when such efforts are begun. Many cases have held that circumstances similar to those here were sufficient to make a fact issue on proximate cause. The cases cited are not analogous on the issues of negligence but are analogous on the issue of proximate cause. See Luck v. Buffalo Lakes Inc., 144 S.W.2d 672 (Tex.Civ.App. Amarillo 1940, writ dismd jdgmt. cor.); Brumm v. Goodall, 16 Ill.App.2d 212, 147 N.E.2d 699 (1958); McFarland v. Grau, supra; Langheim v. Denison Fire Dept. Swimming Pool Ass'n., 237 Iowa 386, 21 N.W.2d 295 (1946); Collins v. Riverside Amusement Part Co., supra; Lindsey v. De Vaux, 50 Cal.App.2d 445, 123 P.2d 144 (1942); Nordgren v. Strong, 110 Conn. 593, 149 A. 201 (1930); City of Longmont v. Swearingen, supra; Brotherton v. Manhatten Beach Imp. Co., 48 Neb. 563, 67 N.W. 479 (1896). A careful analysis reveals that in the cases of this type which have held evidence of proximate cause to be insufficient, there was no evidence to indicate the circumstances surrounding the death. A body was simply found lying under or floating upon the water, with no indication how or when death occurred. See, for example, Hahn v. Perkins, 228 N.C. 727, 46 S.E.2d 854 (1948).

For the reasons stated and in view of the liberal rules approved in Hopson v. Gulf Oil Corp., supra, and many other cases, we conclude there was probative evidence of such causal relation and foresee-

ability as are required for a finding of proximate cause, and that plaintiff was entitled to have such issue submitted to the jury. Points of error 2 and 3 are therefore sustained.

The judgment is reversed and the cause remanded for a new trial. Plaintiff's other point of error is overruled.

## ON REHEARING

In its motion for rehearing, appellee asserts that Mr. Albuquerque testified only that the pole he used did not have a hook or pulling device, and that therefore there is no evidence that the pole used by his companion did not have such a hook.

Mr. Albuquerque testified in part as follows:

" . . . I saw these aluminum poles there, and I picked one up, . . . I picked up another one and gave it to Joe, and *both of us then pushed* . . . This took some time, I don't know how much, but it took seconds or minutes to do this because *the poles, of course, they are long and aluminum, and we use them to push, not pull, because there was no way to get ahold.*" (SF224)

\* \* \* \* \* \*

" . . . Joe and I, we both used the poles, one on each side of the pool . . .". (SF225)

\* \* \* \* \* \*

"Q. Did that pole you talked about have a hook on it?"

"A. No, sir."

"Q. Had it had a hook on it, could you have placed it down into the water, *hooked onto the body and pulled* him out?"

"A. The hook on the end of the pole would make a speedier recovery of the boy . . .".

"Q. . . . *had there been a pole with a hook*, you could have least made it easier for you?"

"A. I would say it would make a speedier recovery." (SF239)

We believe a reasonable interpretation of Albuquerque's testimony is that neither pole had a hook or pulling device. Of course, there was other testimony about poles. One witness testified that there was no pole at all at the pool except a wooden stick about ten feet long. Another witness testified that there was one pole about five feet long which did not have any hook. The motel manager testifed that a "shepherd's crook" was a part of the equipment kept by the motel and that it was in the pool area when Ned Harris drowned. Mr. Nagy testified that the morning after the drowning he inspected the pool and found "the shepherd's hook" pole, which had been bent, but Mr. Albuquerque testified that the pole he used was the one which was bent in the rescue attempt. These were simply conflicts in the testimony which only the jury could resolve and the adverse portions of which we must disregard in determining the propriety of a directed verdict against appellant.

The motion for rehearing is respectfully overruled.